UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　Plaintiff,<br>　　v.<br>MICHAEL WARD,<br>　　　　Defendant. | Case No.16-cr-00485-JST-1<br><br>**ORDER GRANTING MOTION TO SUPPRESS**<br>Re: ECF No. 15 |

Before the Court is Defendant Michael Ward's motion to suppress. The Court will grant the motion.

## I. BACKGROUND

On August 26, 2016, two uniformed Antioch police officers, Officer Meads and Officer Vanderpool, observed a parked Dodge Intrepid with expired registration tabs on the rear license plate in violation of California Vehicle Code section 4000(a). ECF No. 15-1 at 8. The officers pulled over in front of the Dodge and approached on foot. Id. Officer Meads made contact with the driver, Defendant Michael Ward, and asked him for his name and identification. Id. Ward stated his name and handed over a credit card with his name on it and a paper photocopy of his license. Id.; ECF No. 17-1 at 17. According to Officer Meads, Ward "appeared to be very nervous" and was "extremely careful" when opening his wallet "as if he did not want [Officer Meads] to see the contents." ECF No. 15-1 at 8. Officer Meads "ran [the name on the credit card] to see if it corresponded with the individual in the car" and "it appeared to check out." ECF No. 17-1 at 17.

Either before or after running Ward's name—the timing is unclear—Officer Meads "made small talk with Ward." ECF No. 15-1 at 8. Officer Meads learned that Ward was temporarily

living out of his car and was in the area to visit a friend. Id. Then, according to Officer Meads, the following exchange occurred:

> I asked Ward if he was on probation or parole. Ward told me that he was not, but that he used to be on parole. Ward went on to say that he hasn't been in trouble for several years and was doing well. I asked Ward if he had anything illegal in his possession to which he replied, "No". I then said, "Can I search you and your car to make sure?" Ward said, "Sure, if you want to."

Id.

Officer Meads then "had Ward step out of the car and asked him to place his hands on the bank of his head so that [Meads] could conduct a search." Id. Ward, "his voice trembling," said twice, "Man why do you have to do all this?" Id. Believing, "[b]ased on Ward's behavior," that "he had some sort of contraband concealed on his person," Officer Meads "grabbed a hold of Ward's arms so that he could not reach into his pockets." Id. Officer Meads asked Ward to tell him "what contraband he had on him," and when Ward did not respond, Officer Meads "brought Wards [sic] arms to the top of his head and placed him into a standing modified search position." Id. Concerned about Ward's "nervous behavior," Officer Mead "told Wards that he was not under arrest, but that [he] was going to detain him in handcuffs until [he] could verify that he was not armed." Id. During the search of Ward's person, Officer Meads discovered a loaded firearm in Ward's pocket. Id. at 9.

On December 1, 2016, a federal grand jury returned an indictment charging Ward with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922 (g)(1). ECF No. 16 at 3.

Ward now moves to suppress the evidence—namely, the gun—found during the search because: 1) the prolonged stop of Ward violated the Fourth Amendment, 2) Ward's arrest violated the Fourth Amendment, and 3) the search of Ward's person and his car violated the Fourth Amendment. See ECF No. 15.

**II.     ANALYSIS**

    **A.     Length of Traffic Stop**

Recently, in Rodriguez v. United States, the Supreme Court clarified the "the tolerable duration of police inquiries in the traffic-stop context." 135 S. Ct. 1609 (2015). In that case, after

2

pulling Rodriguez over for driving on a highway shoulder and issuing him a ticket, police conducted a dog sniff of Rodriguez's car without his consent. Id. The dog alerted to the presence of drugs and a search of the vehicle revealed a large bag of methamphetamine. Id. Although the dog sniff lasted no more than seven or eight minutes, the Court held that the drugs had to be suppressed because the length of the search violated Rodriguez's Fourth Amendment rights. Id.

The Court explained that "[b]ecause addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose." Id. at 1614. In other words, officers may determine "whether to issue a traffic ticket" and conduct "ordinary inquiries incident to [the traffic] stop . . . [such as] checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. (internal quotation marks and alterations omitted). These checks do not impermissibly prolong a traffic stop because they "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." Id. But officers may not take "measure[s] aimed at 'detect[ing] evidence of ordinary criminal wrongdoing,'" because those efforts are not "fairly characterized as part of the officer's traffic mission." Id. at 1615 (quoting Indianapolis v. Edmond, 531 U.S. 32, 40–41 (2000)). The Court placed the dog sniff of Rodriguez's vehicle firmly in the second, impermissible category.

The Court also rejected the government's argument "that an officer may 'incrementally' prolong a stop to conduct a dog sniff so long as the officer is reasonably diligent in pursuing the traffic-related purpose of the stop, and the overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances.'" Id. at 1616. Rather, the Court held that even a de minimis intrusion on Rodriguez's personal liberty justified suppression. Id. As the Court explained, "[i]f an officer can complete traffic-based inquiries expeditiously, then that is the amount of time reasonably required to complete the stops mission." Id. (internal quotation marks and alteration omitted). The Court also deemed it irrelevant "whether the the dog sniff occurs before or after the officer issues a ticket." Id. So long as "conducting the sniff prolongs—i.e., adds time to—the stop," it is unlawful. Id.

The Ninth Circuit recently applied Rodriguez to a traffic stop in United States v. Evans,

3

786 F.3d 779 (9th Cir. 2015). In Evans, police pulled the defendant over for "violating two Nevada traffic laws prohibiting unsafe lane changes and following a vehicle too closely." Id. at 782. An officer "performed vehicle records and warrants checks, tasks that are "ordinary inquiries incident to the traffic stop," and "then requested an additional one—an ex-felon registration check on Evans, to inquire as to Evans' criminal history and confirm whether Evans was registered at the address he provided to [the officer]." Id. The officer also conducted a dog sniff of Evans' car. Id.

Applying Rodriguez, the Ninth Circuit held that, "by conducting an ex-felon registration check and a dog sniff, both of which were unrelated to the traffic violation for which he stopped Evans, [the officer] 'prolonged [the traffic stop] beyond the time reasonably required to complete' his traffic 'mission,' and so violated the Fourth Amendment." Id. at 786 (quoting Rodriguez, 135 S. Ct. at 1612). "The ex-felon registration check, unlike the vehicle records or warrants checks, . . . was 'a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" Id. The court noted that the officer "himself testified that when he decided to run the various checks, he believed he had 'something more than a simple traffic violation here.'" Id. It was "immaterial" that the "ex-felon registration check took place before, rather than after, the officer issued Evans a ticket." Id.

Under Rodriguez and Evans, Officer Meads impermissibly prolonged Ward's traffic stop. Officer Meads own report describes the following exchange:

> I asked Ward if he was on probation or parole. Ward told me that he was not, but that he used to be on parole. Ward went on to say that he hasn't been in trouble for several years and was doing well. I asked Ward if he had anything illegal in his possession to which he replied, "No". I then said, "Can I search you and your car to make sure?" Ward said, "Sure, if you want to."

ECF No. 15-1 at 8. These inquiries are not "fairly characterized as part of the officer's traffic mission." Rodriguez, 135 S. Ct. at 1615. Like the ex-felon registration check, Officer Meads' questions were "measure[s] aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" Id. (quoting Indianapolis, 531 U.S. at 40–41). Indeed, Meads explicitly asked Ward "if he had anything illegal in his possession." That question has no connection to the expired registration tag that prompted the traffic stop. Similarly, whether Ward was on probation on parole is "wholly

4

unrelated to [Meads'] 'mission of 'ensuring that vehicles on the road are operated safely and responsibly.'" Evans, 786 F.3d at 786 (quoting Rodriguez, 135 S. Ct. at 1615). Simply put, Officer Meads' inquiries went beyond the "ordinary inquiries incident to [the traffic] stop . . . [such as] checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Rodriguez, 135 S. Ct. at 1615 (internal quotation marks and alterations omitted).

Another court in this district came to the same conclusion on similar facts. Amanuel v. Soares, No. 13-CV-05258 NC, 2015 WL 3523173, at *7 (N.D. Cal. June 3, 2015); see also United States v. Cornejo, 196 F. Supp. 3d 1137, 1153 (E.D. Cal. 2016) (finding that "questioning on unrelated topics" impermissibly "added time to the traffic stop"). In Amanuel, a police officer initiated a traffic stop because the defendant made a right hand turn from the middle lane. Id. at *2. Before issuing a citation, the officer "confirmed with Amanuel that he [was] not on probation or parole" and then "began asking Amanuel questions about a prior arrest." Id. at *7. The court found that "[t]hese questions [were] akin to the ex-felon check in Evans and . . . not reasonably related to the traffic infraction." Id. Officer Meads' questions during Ward's traffic stop require the same conclusion.

In its supplemental brief, the government offers no persuasive basis for distinguishing Rodriguez. First, the government argues that neither Rodriguez nor Evans prohibited Officer Meads from "question[ing] defendant about his identity." ECF No. 20 at 4. This argument is a straw man. Ward does not claim that requests for identification run afoul of Rodriguez, because those questions were clearly related to the purpose of the stop; rather, it was Officer Meads' subsequent questions that crossed the line into an attempt to detect "ordinary criminal wrongdoing." Second, the government argues that Officer Meads' "small talk" did not "transform[] the traffic stop into an impermissibly prolonged encounter." ECF No. 20 at 4. But "small talk" is not what occurred. Asking about parole and probation status or inquiring whether a person has anything illegal in his vehicle are attempts by law enforcement to uncover criminal activity, not casual conversation. Nor are those questions related, as the government claims, "to the mission of the traffic stop." ECF No. 20 at 4. Third, the government argues that any delay

5

was so short it did not matter. Id. at 5. But as the Court explained above, the Supreme Court in Rodriguez rejected the argument that "dog sniffs that occur within a short time following the completion of a traffic stop are not constitutionally prohibited if they constitute only de minimis intrusions." Id. at 1613-14. Thus, the fact that Officer Meads' questions may only have lasted a few minutes does not make them lawful. In any event, the search of Ward's person and car only occurred because of Officer Meads' impermissible questioning. Especially taken together, the questioning and searches measurably extended the duration of Ward's traffic stop.

Nor would the fact that Ward consented to[1] the search of his person and vehicle wipe away the problem of the traffic stop's duration. If the rule in Rodriguez and Evans is to have any force, the police cannot prolong a driver's detention for the purpose of eliciting consent for a search to uncover ordinary criminal activity and then rely on that consent to excuse the length of the stop. Given the inherently coercive environment of a traffic stop, see Delaware v. Prouse, 440 U.S. 648, 657 (1979) (describing traffic stops as possibly "unsettling" and having the capacity to provoke "substantial anxiety"), such an exception would undermine the Fourth Amendment rights Rodriguez was intended to protect.

### B. Inevitable Discovery

The government argues that, even if Ward's traffic stop were unreasonably long, if the arrest were improper, or if Ward's consent were involuntary, the firearm would inevitably have been discovered. ECF No. 16 at 8. Specifically, the government claims that the officers could have effected a custodial arrest under California Vehicle Code section 40302(a) because Ward "failed to provide the officer[s] satisfactory evidentiary proof of identity." Id. The officers then could have conducted a search incident to arrest. See generally Davis v. United States, 564 U.S. 229 (2011). The Court agrees with Ward, however, that the doctrine does not apply.

Where inevitable discovery "from circumstances other than those disclosed by the illegal search itself" is "unrealistic" as a factual matter, the doctrine cannot be used to overcome to exclusionary rule. United States v. Boatwright, 822 F.2d 862, 864-65 (9th Cir. 1987). Here, the

---

[1] The Court assumes for the purposes of this order, without deciding, that Ward's consent was voluntarily given.

government has not met its burden to "show by a preponderance of the evidence that the contraband or other material seized would have been discovered inevitably by lawful means." United States v. Andrade, 784 F.2d 1431, 1433 (9th Cir. 1986). First, Officer Meads specifically told Ward before searching him that he was "*not* under arrest." ECF No. 15-1 at 8. Given that statement, it is difficult for Officer Meads to argue credibly that he would separately have conducted a search incident to arrest. Moreover, using the credit card and photocopy of Ward's license, Officer Meads "ran [the name on the credit card] to see if it corresponded with the individual in the car" and "it appeared to check out." ECF No. 17-1 at 17.[2] This, too, casts doubt on the argument that Office Meads would have arrested Ward under California Vehicle Code section 40302(a) for "fail[ing] to provide the officer[s] satisfactory evidentiary proof of identity." The Court therefore rejects the government's invocation of the inevitable discovery doctrine.

### C. Suppression as a Remedy

Suppression is the appropriate remedy here. The government's argument to the contrary rests solely on Herring v. United States, 555 U.S. 135 (2009). Under Herring, if an officer acted in "good faith" when conducting an ultimately unreasonable search or seizure, the exclusionary rule does not apply. Id. at 142 (citing United States v. Leon, 468 U.S. 897, 922 (1984). The burden of demonstrating good faith rests with the government and the test is an objective one: "whether a reasonably well trained officer would have known that the search was illegal in light of all the circumstances." Id. at 145. As Ward points out, however, Herring's good faith exception only applies when the officer relies on someone or something else when taking the challenged action. "The Supreme Court has never applied the good faith exception to excuse an officer who was negligent himself, and whose negligence directly led to the violation of the defendant's constitutional rights." United States v. Camou, 773 F.3d 932, 944-45 (9th Cir. 2014). There is no

---

[2] In its opposition to the motion, the government omits mention of Ward's copy of his driver's license and goes so far as to say, "The defendant did not produce *any* form of identification to Officer Meads, and instead showed the officer a credit card with his name on it." ECF No. 16 at 2 (emphasis added). Officer Meads' police report also omitted any mention of Ward's having a copy of his license. ECF No. 16-1 at 9. On reply, Ward placed into evidence the testimony of Officer Meads, who acknowledged on cross-examination that he received the document from Ward. ECF No. 17-2 at 17.

allegation here that Officer Meads relied on "anyone or anything" in seizing and searching Ward. Id. Accordingly, Herring does not apply.

## CONCLUSION

The Court grants the motion to suppress.

IT IS SO ORDERED.

Dated: May 1, 2017

_____
JON S. TIGAR
United States District Judge